[Civ. No. 24951. Second Dist., Div. One. June 26, 1961.]

GREAT LAKES AIRLINES, INC. (a Corporation) et al., Respondents, v. P. D. SMITH et al., Appellants.

N. E. Youngblood for Appellants.

Keatinge & Older, Charles H. Older, Beardsley, Hufstedler & Kemble, Charles H. Beardsley, Seth V. Hufstedler and John Sobieski for Respondents.

WOOD, P. J.—There were three causes of action in the complaint herein, as amended and supplemented. The first cause of action was dismissed by plaintiffs at the former trial. The second cause of action was for a declaration that plaintiffs had validly exercised an option (under a lease) to buy an aircraft. The third cause of action was for damages for breach of warranties stated in a lease and a conditional sale agreement regarding the aircraft. The warranties related to the amount of flying time on the ''airframe'' since it was last overhauled.

In a former trial of this case, the judgment with respect to the second cause of action (exercising the option) was in favor of plaintiffs; and the judgment with respect to the third cause of action (damages) was for defendants. On appeal, after the former trial, the part of the judgment as to the second cause of action was affirmed; and the part of the judgment as to the third cause of action was reversed. (*Great Lakes Airlines, Inc.* v. *Smith,* 167 Cal.App.2d 625 [334 P.2d 1004].) As a result of that appeal, the only cause of action remaining undetermined was the third cause of action.

The basis for the reversal on the former appeal was that the trial judge erred in ruling that certain conversations relative to overhauling the aircraft were not admissible (in that the conversations would tend to vary the terms of a written agreement). It was held on the former appeal that a portion of the written agreement was ambiguous and that parol evidence should have been received to explain the agreement.

Upon a nonjury retrial as to the third cause of action, testimony regarding the conversations was received and judgment was in favor of plaintiffs, as follows: Damages in the amount of $56,525.22, representing the cost of overhauling the airframe of the aircraft. Interest thereon in the amount of $12,870.49. Damages in the amount of $14,000 for loss of use of the aircraft while it was being overhauled. Attorneys' fees in the amount of $16,000.

Defendants appeal from the judgment.

In July 1954, a Douglas C-54B aircraft was damaged in a ''take off'' in Tokyo, Japan. At the time of the accident the aircraft was owned by Northwest Airlines, Inc. In September 1954, while the aircraft was in a damaged condition on an airfield in Tokyo, defendant P. D. Smith examined it. He purchased it from Northwest Airlines (or its insurance carrier) in January 1955.

The aircraft was a large "four-engine transport type aircraft," and was used for transportation of passengers or cargo.

The aircraft was restored to flying condition by the Japanese Aircraft Maintenance Company in Tokyo. In so restoring the airplane, a center portion thereof was replaced with a used center portion which Mr. Smith bought from plaintiff Great Lakes Airlines. About June 1955, while such work on the aircraft was being performed, a representative of plaintiffs (who had licenses as an aircraft mechanic and pilot) went to Tokyo and observed the aircraft and the work that was being done on it. In August 1955, the aircraft was flown to Burbank, California.

On September 13, 1955, the defendant P. D. Smith, as owner of the aircraft, and the plaintiffs Mr. and Mrs. Hermann, co-partners doing business as Nevada Aero Trades Company, entered into a written lease whereby the defendant P. D. Smith leased the said aircraft to plaintiffs Mr. and Mrs. Hermann for a period of four years. The lease also provided that the lessees were granted an option to purchase the aircraft, after seven months from the date of the lease and within the lease period, for $600,000 cash, or for $630,000 payable in monthly installments. It was also provided in the lease that if the option was exercised the sale would be effected by means of a Conditional Sale Agreement, a copy of which was attached to and made a part of the lease.

A further provision in the lease was that the lessee might sublease the aircraft to Great Lakes Airlines, Inc., provided the sublease was made subject to the terms and conditions of the lease. Since September 13, 1955, Great Lakes Airlines, Inc., has been the sublessee of the aircraft.

On April 14, 1956, pursuant to provisions of the lease, the plaintiffs Mr. and Mrs. Hermann exercised their option to purchase the aircraft in accordance with the terms of the conditional sale agreement referred to in the lease.

Paragraph 16 of the lease provides, in part, as follows: "WARRANTIES: LESSOR represents, covenants and warrants as follows: . . . (d) At the time of the delivery of said aircraft to LESSEE, LESSOR shall furnish LESSEE with all of the aircraft records pertaining to said aircraft as required to be kept by the Civil Aeronautics Administration, and said records shall be accurate and complete and shall contain all entries necessary to make said records accurate and complete as of the date and time of the delivery of said aircraft to LESSEE."

Paragraph 21 of the conditional sale contract provides: "It

is hereby agreed by BUYER and SELLER that the representations, covenants and warranties contained in paragraph 16 of the certain Lease of Aircraft dated September 13, 1955, between BUYER and SELLER, are hereby incorporated in this Conditional Sale Agreement and made a part hereof.''

In August and September 1955, prior to the execution of the lease on September 13, 1955, the defendant Mr. Smith stated orally to representatives of plaintiffs that the airframe of the aircraft had been overhauled in Tokyo, during 1955, in accordance with the regulations of the United States Civil Aeronautics Administration, that the airframe had been ''zeroed or zero-timed'' (overhauled and returned to ''no time'' condition), and that plaintiffs would be acquiring a practically new aircraft by reason of such overhauling. During that time Mr. Smith also told plaintiffs' representatives that when the aircraft returned to the United States the only flying time on the airframe was approximately 42 hours, which consisted of approximately 2 hours of testing in Tokyo and 40 hours of flying across the Pacific Ocean. He also said that he had or he would obtain records which would substantiate the fact that the airframe had been overhauled in Tokyo and that the airframe had only 42 hours on it since its last overhaul.

In paragraph 4 of the lease there was a provision that ''. . . it is agreed by and between LESSOR and LESSEE that as of the date hereof . . . said aircraft has forty-two (42) hours since last major airframe overhaul.''

The aircraft records which were delivered to plaintiffs at or before the delivery of the aircraft to plaintiffs on September 13, 1955, did not show that a major overhaul of the airframe had been performed in Tokyo in 1955, or that the airframe had been ''zeroed'' or ''zero-timed'' in Tokyo, or that the aircraft had been operated only 42 hours since it was last overhauled in Tokyo. The only record furnished to plaintiffs by Mr. Smith at or before delivery of the aircraft, regarding the operating time since the last major overhaul, was a letter from the Northwest Airlines, the former owner, showing that at the time of delivery of the aircraft to plaintiffs the aircraft had been operated 8,152 hours since the last major overhaul according to the records of Northwest Airlines.

About November 2, 1955, the defendant P. D. Smith assigned to defendant P. D. Smith, Inc., a corporation, all of his interest in the aircraft and the lease.

Under the regulations of the United States Civil Aeronautics Administration (now known as Federal Aviation Agency),

which regulations were in effect in 1955 and 1956, plaintiffs were required to overhaul the airframe after each period of 11,000 hours of operation of the aircraft. In May 1956, the Civil Aeronautics Administration extended such period of time to 12,500 hours. That extension was based upon the only record which had been furnished as of that time to plaintiffs, showing the operating time since the last major overhaul (i.e., the letter from the former owner, Northwest Airlines).

Plaintiffs made numerous demands upon defendants after September 13, 1955, to deliver to plaintiffs the aircraft records which, according to the lease and the oral representations of Mr. Smith, were to be delivered to plaintiffs.

The records regarding the work done on the aircraft in Tokyo were not delivered to plaintiffs until October 12, 1956, which was after plaintiffs had been required to overhaul the airframe as hereinafter referred to. There was evidence that such records were not delivered to plaintiffs, prior to the time plaintiffs were required to overhaul the airframe, for the reason that Mr. Smith and his superintendent (who was in charge of the work in Tokyo) were having a controversy concerning the expense account of the superintendent, and the superintendent was retaining the records in his possession.

In July and August 1956, plaintiffs were required by the Civil Aeronautics Administration to perform a major airframe overhaul of the aircraft. The overhaul was performed in accordance with the overhaul period which had been established for the aircraft by said administration, and which determination establishing such period was based upon the only aircraft records which, as of that time, had been furnished by defendants to plaintiffs. As a result of the failure of defendants to deliver the aircraft records to plaintiffs in accordance with the lease, the conditional sale agreement, and the oral representations of defendant Mr. Smith, the plaintiffs were required to perform the major airframe overhaul 6,648 hours sooner than would have been necessary if defendants had furnished the records required to be furnished under said lease agreement and representations.

On October 12, 1956, after plaintiffs had completed the major airframe overhaul, the defendants delivered to plaintiffs aircraft records showing that a major airframe overhaul had been performed on the aircraft in Tokyo in 1955, prior to the delivery of the aircraft to plaintiffs. Those records were in existence on September 13, 1955, when the aircraft was delivered to plaintiffs.

If, prior to the time plaintiffs overhauled the airframe, the defendants had delivered to plaintiffs the Tokyo records which were delivered to plaintiffs on October 12, 1956, those records would have been accepted by the Civil Aeronautics Administration as evidence establishing that a major airframe overhaul had been performed in Tokyo as orally represented by defendant Mr. Smith, and the plaintiffs would not have been required to overhaul the airframe 6,648 hours prematurely during July and August 1956.

Plaintiffs expended $56,525.22 in performing the overhaul. The reasonable rental value of the aircraft during the month it was being overhauled by plaintiffs was $14,000.

The findings of the court included findings which were in substance the same as the statements of fact hereinabove mentioned. The findings are supported by substantial evidence. Appellants (defendants) do not assert insufficiency of the evidence.

Appellants assert that the court erred in receiving evidence as to the alleged oral representations of Mr. Smith concerning the "air time" on the airframe after the overhaul in Tokyo. They argue that such evidence violated the parol evidence rule in that the lease and conditional sale agreement superseded the prior negotiations. As above stated, it was decided on the former appeal that parol evidence was admissible. (*Great Lakes Airlines, Inc.* v. *Smith*, 167 Cal.App.2d 625, 629 [334 P.2d 1004].) That declaration on the former appeal became the law of the case with respect to receiving evidence as to the alleged oral representations. This contention is not sustainable.

Appellants also assert that the court erred in denying their motion for an order excluding prospective witnesses from the courtroom. They argue that by reason of the fact that the determination of the action would depend upon conflicting testimony the defendants were entitled to have the witnesses excluded from the courtroom until after they testified. Whether or not witnesses should be excluded was a matter within the discretion of the judge. (*People* v. *Lariscy*, 14 Cal.2d 30, 32 [92 P.2d 638]; *People* v. *Persky*, 167 Cal.2d 134, 139 [334 P.2d 219].) The judge did not abuse his discretion in denying the motion.

Appellants contend further that the court erred in not construing the alleged ambiguity (as to warranties) against the plaintiffs. With reference to this contention, appellants refer to a provision in the lease which states: "In

the event the option to purchase . . . is exercised . . . there shall be no adjustment made for either engine or airframe hours. . . ." They quote from cases wherein it is said that uncertainty in a written agreement should be interpreted most strongly against the person who caused the uncertainty to exist. There was testimony on behalf of plaintiffs that the lease, with the exception of paragraph 16 (regarding warranties) and one or two other provisions, was prepared by the attorneys for defendant Mr. Smith. An attorney for plaintiffs testified that the attorneys for Mr. Smith prepared the draft of the agreement "as it is" and that Mr. Smith refused to change anything and presented it with a statement to the effect, "This is the way it is going to be, and if you don't like it, we don't have a deal." That witness also testified that he was able to get paragraph 16 and one or two other things written into the agreement. It is to be assumed that the court in making its findings considered the principle of law with respect to interpreting a written agreement. It does not appear that the court erred in construing the lease with reference to the warranties.

Appellants also contend that the evidence does not support a judgment against the corporation P. D. Smith, Inc. They argue (1) that the only connection "between the corporation and the transaction herein" was that P. D. Smith, individually, assigned his interest in the lease to the corporation P. D. Smith, Inc.; (2) that there was no evidence that the corporation assumed any of the obligations under the lease; and (3) that the corporation was not in existence when the lease was executed. The lease was made on September 13, 1955, between P. D. Smith, as lessor, and Mr. and Mrs. Hermann, as lessees. Paragraph 10 therein, relating to assignment of the lease, provides, in part: "It is understood and agreed that Lessor is contemplating the formation of a corporation to which said aircraft, *subject to the within lease,* is to be transferred. . . ." (Emphasis added.) It thus appears that the corporation P. D. Smith, Inc., in accepting the transfer of the aircraft from P. D. Smith in November 1955, took the aircraft subject to the provisions of the lease. Furthermore, it is to be noted that the corporation P. D. Smith, Inc., executed the conditional sale agreement in April 1956, and that agreement included paragraph 16 of the lease which contained the warranty provisions. Paragraph 21 of the conditional sale agreement provided: "It is hereby agreed by Buyer and Seller that the representations, covenants and warranties contained

in paragraph 16 of that certain Lease of Aircraft dated September 13, 1955, between Buyer and Seller, are hereby incorporated in this Conditional Sale Agreement and made a part hereof." It therefore appears that P. D. Smith, Inc., not only accepted the assignment subject to the provisions of the lease, but it became a party to the conditional sale agreement which incorporated therein by reference all the warranty provisions of the lease. The evidence was sufficient to support a judgment against the corporation P. D. Smith, Inc.

Appellants contend further that the court erred in not making a finding on the issue that P. D. Smith, Inc., was not a party to the lease and that said corporation was not formed until after the lease was executed. This contention is similar to the preceding contention, which was to the effect that judgment should not have been against the corporation. The statements just made in discussing the preceding contention are applicable to this contention. It may be said futher that it was implicit in the findings that P. D. Smith, Inc., was not a party to the lease. One of the findings was that Mr. and Mrs. Hermann, as copartners, and the defendant P. D. Smith entered into the lease which was received in evidence as Exhibit 1. The lease shows that the corporation did not execute the lease. It was also implicit in the findings that the corporation had not been formed when the lease was made. As above shown, the lease which was referred to in the findings stated that P. D. Smith, the lessor, was contemplating the formation of a corporation to which said aircraft would be transferred. There was a finding that on November 2, 1956, that defendant P. D. Smith assigned his interest in the aircraft to P. D. Smith, Inc. The findings were sufficient with respect to the issue that the corporation was not a party to the lease and that the corporation had not been formed when the lease was executed.

Appellants contend further that it was error to award judgment in favor of both plaintiffs—Great Lakes Airlines, Inc., and Mr. and Mrs. Hermann, doing business as Nevada Aero Trades Company. Appellants refer to a finding which was as follows: "At all times from and after September 13, 1955, plaintiff Great Lakes Airlines, Inc., has been the sublessee of said aircraft from Nevada Aero Trades Company." They (appellants) argue to the effect that since there was such a finding it was error to render judgment in favor of

both plaintiffs. The lease provided that it was not assignable, but that the lessee "may sublease said aircraft to Great Lakes Airlines, Inc., provided, however, that (1) any such lease shall be made specifically subject to the terms and conditions of this lease . . . (2) . . . (3) no such sublease shall relieve Lessee of any of its obligations hereunder. . . ." The lease also provided that during the term of the lease, the "Lessee shall at its own expense maintain the aircraft . . . equipment . . . and accessories . . . in compliance with all applicable maintenance or safety requirements of the Civil Aeronautics Administration Approved Master Copy of Great Lakes Airlines, Inc. DC-4 Maintenance Manual. . . . All maintenance and repair work shall be performed by personnel duly licensed to perform such work and shall be in accordance with minimum standards of the United States Aeronautics Administration and in accordance with standards set forth in the . . . Approved Master Copy of Great Lakes Airlines, Inc. DC-4 Maintenance Manual in the maintenance and repair of other aircraft of the same type operated by Great Lakes Airlines, Inc." The evidence shows that representations by Mr. Smith concerning the airframe time, the performance of an airframe overhaul in Tokyo, and the existence and delivery of aircraft records were made to officers and employees of Great Lakes Airlines, Inc., and to the partners and employees of Nevada Aero Trades Company. The evidence shows that plaintiffs Mr. and Mrs. Hermann, who are the partners doing business as Nevada Aero Trades Company, are also the sole stockholders and are officers of Great Lakes Airlines, Inc. Mr. Patterson, vice-president of Great Lakes Airlines, Inc., testified that the above representations as to airframe time, overhauling, and records were made to him by Mr. Smith before the lease was executed. Mr. Richards, superintendent of maintenance for Great Lakes, testified that said representations were made to him by Mr. Smith before the lease was executed. Mr. and Mrs. Hermann also testified that said representations were made to them before the lease was executed. It is thus apparent that it was agreed, at the time the lease was made, that the aircraft would be subleased to and would be operated and maintained by Great Lakes. It is also apparent that said oral representations of Mr. Smith were made to officers and employees of Great Lakes before the lease was executed. Under the circumstances, the court could properly find and conclude that the oral representations were made for the benefit of Great Lakes as well as for plaintiffs Mr. and Mrs. Hermann. The court

did not err in rendering judgment in favor of both plaintiffs (Great Lakes and the Hermanns).

Appellants also contend that the amount of damages awarded was excessive. There was evidence that when plaintiffs were required by the Civil Aeronautics Administration to overhaul the airframe in July and August 1956 (because they could not produce records showing the recent overhaul in Tokyo), there were, in fact, 6,648 hours of flying time remaining (in the period of 11,000 hours) since the last overhaul, which was performed in Tokyo. It would appear that since 6,648 hours of the allotted 11,000 hours remained after the last overhaul, there were 4,352 hours of flying time (difference between 6,648 and 11,000) that had been used after the last overhaul. Appellants argue, in support of their contention that the damages awarded were excessive, that the amount reasonably required to overhaul the airframe should have been apportioned so that plaintiffs, who had the benefit of 4,352 hours of flying time on the airframe, would be required to pay their pro rata share of the overhaul expense. In other words, appellants' position is that since plaintiffs had the benefit of 4,352 hours, or approximately 40 per cent of the allotted 11,000 hours, the plaintiffs should have been required to pay approximately 40 per cent of the overhaul expense. Respondents (plaintiffs) assert, with respect to such argument of appellants, that appellants "assume that the cost of an overhaul after 4,400 hours of use is less than the cost of an overhaul performed after 11,000 hours of use. But the record is devoid of any evidence to support such a conclusion. The record shows that the aircraft operator must follow the same maintenance manual and perform the same overhaul as set forth in the manual, regardless of the number of hours in the overhaul period. Differences in the total cost of different overhauls result from differences in the condition of the aircraft at the time of such overhauls. The same steps must be followed in performing each overhaul, regardless of whether or not it is necessary to repair or replace any part of the aircraft as a result of tests or inspections performed during the overhaul." As a result of appellants' failure to deliver the aircraft records regarding the overhaul in Tokyo, the plaintiffs were required to perform the overhaul 6,648 hours sooner than would have been necessary if appellants had delivered the records according to the agreement and oral representations. It is true that at the expiration of the allotted 11,000 hours (or 12,500 hours

as extended) the plaintiffs would have been required, according to aircraft regulations, to overhaul the airframe. Under the circumstances here, where plaintiffs were required to perform the overhaul 6,648 hours prematurely, it is apparent that those hours of airframe use were lost and cannot be regained. Each subsequent overhaul, at the end of each allotted period of airframe time, will be approximately 6,600 hours ahead of the time such overhaul would have been required if plaintiffs had not been required to overhaul the airframe prematurely on this present occasion. The question as to the detriment suffered by plaintiffs was a question of fact for the trial court. There was substantial and competent testimony to the effect that $56,525.22, the amount paid by plaintiffs for the overhaul, was the reasonable value of the services and materials furnished in making the overhaul. It appears that appellants do not assert that such amount was not reasonable, but they assert that such amount should be apportioned as hereinabove mentioned.

Appellants also contend that there should have been an apportionment of the amount representing loss of use of the aircraft during the overhaul. Their argument is that eventually the plaintiffs would have had to overhaul the airframe and at that time there would have been the same period of loss of use; and that since plaintiffs had the use of the aircraft approximately 40 per cent of the allotted hours (before the usual overhaul time), the plaintiffs should pay 40 per cent of the amount representing loss of use. The statements made hereinabove regarding the expenses of the overhaul are applicable here.

Appellants also assert that the court should not have allowed the cost of overhauling the right landing gear and the center wing attaching bolts in the approximate amount of $1,700. Their argument is that Mr. Patterson, a representative of plaintiffs, testified that he was told, before the lease was executed, that there would be no overhaul of the above-mentioned parts. It appears that Mr. Patterson was referring to a conversation with Mr. Smith in Hong Kong and to a conversation with Mr. McClaskey (an agent of Mr. Smith) in Tokyo during June or July 1955. There was evidence that thereafter Mr. Smith made representations to plaintiffs and representatives of plaintiffs relative to the airframe having been ''zeroed'' in Tokyo, and that no exceptions were made by him as to any work not performed on the landing gear or wing bolts. It was a question of fact as to whether the above-

mentioned items were proper items in the overhaul which plaintiffs were required to make. Furthermore, the record does not show the cost of overhauling those items.

Appellants contend further that the court should not have allowed approximately $4,300 for overhauling the interior of the cabin. They argue that an overhaul of the airframe does not include the interior upholstery, but even if it be assumed that the defendants were liable therefor, they were entitled, under the circumstances here, to have the cost apportioned so that they would not be required to pay more than 20 per cent of the cost. The 20 per cent figure is based upon evidence that there were about 32,000 hours of flying time "on" the original interior, and upon evidence that plaintiffs had lost about 6,600 hours of flying time (i.e., 6,600 is about 20 per cent of 32,000). There was substantial and competent evidence that it was necessary to replace the interior as a part of the overhaul. Furthermore, the record does not show whether the interior that was removed was the original interior. It was a question of fact whether the replacement of the interior was necessary as a part of the overhaul.

Appellants also contend that interest should not have been allowed. Their argument is that since the claim of plaintiffs was unliquidated and could not be calculated on the basis of any information in the agreement, interest was not allowable. This point relative to error in allowing interest was raised for the first time in appellants' reply brief. Section 16, subdivision (g), of the lease provides: "In the event that any representation, covenant or warranty herein is untrue in whole or in part or is breached by Lessor, Lessor shall indemnify and hold harmless Lessee from any liability resulting therefrom and shall pay to Lessee any and all damages, costs, and expenses suffered by Lessee as a result thereof, *including interest* at the highest lawful rate *upon any sums paid by Lessee* for or on behalf of Lessor as a result of such untruth or such breach. . . ." (Italics added.) Said section 16 of the lease is incorporated in the conditional sale agreement (section 21 of the agreement). The court found that, under the provisions of paragraphs 16(g) and 16(h) of the lease and paragraph 21 of the conditional sale agreement, plaintiffs were entitled to interest at the rate of 7 per cent per annum from September 1, 1956, on $56,525.22 which amount represents the cost to plaintiffs of the overhaul. It is true, as appellants

assert, that the claim of appellants was unliquidated, but it appears that appellants agreed to pay interest. The court did not err in allowing interest.

The findings are supported by the evidence.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied July 18, 1961, and appellants' petition for a hearing by the Supreme Court was denied August 23, 1961. Schauer, J., was of the opinion that the petition should be granted.