[Civ. No. 28394. Second Dist., Div. Three. May 5, 1966.]

P. D. SMITH et al., Plaintiffs and Appellants, v. GREAT LAKES AIRLINES, INC., et al., Defendants and Respondents.

Goldstein, Bernson & Wolf, Harold B. Bernson and John L. Moriarity for Plaintiffs and Appellants.

Robert A. Eaton for Defendants and Respondents.

KAUS, J.—This is the third time that the airframe of a certain Douglas C-54B aircraft has occupied the attention of this court. The background of the present controversy is detailed in the opinion written by Justice Wood in *Great Lakes Airlines, Inc.* v. *Smith,* 193 Cal.App.2d 338 [14 Cal. Rptr. 153]. For convenience we briefly summarize it as follows:

On September 13, 1955, one of the present plaintiffs, P. D. Smith, leased the aircraft in question to the present defendants, who were also granted an option to purchase it. This option was exercised by them on April 14, 1956. At the time of the lease Smith had represented orally that in 1955 the airframe of the aircraft had been overhauled in Tokyo in accordance with the regulations of the Civil Aeronautics Administration (''C.A.A.''). He also promised that he would obtain records which would substantiate this representation. The effect of this representation, if true, was that no major overhaul of the airframe would have been required for at least 11,000 hours of operation.

Although such a major overhaul of the airframe had apparently been accomplished in Tokyo in 1955, Smith was unable to provide the purchasers, to whom we collectively refer as ''Great Lakes'', with the necessary documentation and in July and August of 1956 the C.A.A. required another major airframe overhaul. Smith delivered the records which substan-

tiated his representation about the 1955 Tokyo overhaul after this partially[1] unnecessary overhaul in 1956 was accomplished.

After two trials[2] Great Lakes obtained a judgment against Smith which became final in late 1961. The amount of the judgment, which included the cost of the overhaul, interest thereon, damages for loss of use and attorneys' fees approximated $110,000.

Not quite two years after this judgment became final the former defendants, Smith and P. D. Smith Inc.,[3] filed an action in the superior court against the former plaintiffs. A judgment in favor of defendants was entered after the trial court sustained a demurrer to the first amended complaint without leave to amend.

The first amended complaint, which is in three counts, alleges in substance as follows:

*First Count.* The pleader refers to the earlier action, the judgment therein and to the appeal. He correctly states that the subject matter of that action was that Great Lakes was required by the Federal Aviation Agency[4] (''F.A.A.'') to perform a premature major airframe overhaul because Smith had not delivered the records pertaining to the Tokyo overhaul in 1955. It is then alleged that no such overhaul was in fact performed, but that Great Lakes and certain F.A.A. officials had conspired to make it so appear before and at the trial.

The complaint charges fraudulent representations made to Smith by these officials before the first trial to the effect that Great Lakes had accomplished a major airframe overhaul. One F.A.A. official then falsely testified to the same effect. Smith relied on these representations because of the official status of the maker who had conspired with defendants to mislead Smith and the court.

---

[1]At the time of the 1956 overhaul Great Lakes had flown the aircraft for a total of 4,352 hours. This fact formed the basis of a claim that it should contribute to the cost of the 1956 overhaul in the same ratio that 4,352 bears to 11,000. This contention was refuted by the court. (*Great Lakes Airlines, Inc.* v. *Smith,* 193 Cal.App.2d 338, 349-350 [14 Cal.Rptr. 153].)

[2]The first trial resulted in a judgment for Smith which was reversed on appeal. (*Great Lakes Airlines, Inc.* v. *Smith,* 167 Cal.App.2d 625 [334 P.2d 1004].)

[3]The status of P. D. Smith Inc., is discussed and explained in *Great Lakes Airlines, Inc.* v. *Smith,* 193 Cal.App.2d 338, 346-347 [14 Cal.Rptr. 153].

[4]The Federal Aviation Agency is the successor agency of the Civil Aeronautics Authority. (49 U.S.C.A. § 1341.)

Further allegations are to the effect that the falsity of these representations was not 'discovered until January 1963. Just what plaintiff discovered is somewhat mysterious, but doing the best we can we gather that it was ascertained shortly after the first judgment became final that the airframe had been placed on a ''one shot overhaul.'' The complaint alleges that this is a term of art peculiar to airline operators and F.A.A. officials, but it never says just what it means.[5] Anyway, Smith discovered that Great Lakes had not performed a major overhaul in 1956.

*Second Count.* After incorporating the references to the issues in the first action, this count alleges:

Defendants concealed a special arrangement with the F.A.A. whereby they were permitted ''by unauthorized means to credit prior repairs, replacements, maintenance and partial overhaul to the subsequent officially required overhaul beginning on July 20, 1956.'' Great Lakes, however, was on a ''one-shot overhaul'' basis which did not allow such a credit and that in spite of the credit arrangement Great Lakes maintained that all but an insignificant amount of the cost of the overhaul was incurred after July 20, 1956. In fact several major repairs were done before that date. Since in the first action Smith was only liable for expenses incurred as a result of the F.A.A.'s order of July 20, 1956, to overhaul the airframe, the concealment of the credit arrangement was ''extrinsic fraud on the court and on plaintiff.'' If the truth had not been kept from the court, Great Lakes would not have recovered the amounts credited to the overhaul.

*Third Count.* This count is a common count for money had and received in the sum of $127,944.

*Prayer.* The prayer of the complaint is that the judgment in the first action be declared null and void, vacated and set aside and that Great Lakes be required to account to Smith for all monies received from Smith ''pursuant to said judgment in the amount of $127,944.04.'' There is also a prayer for an equitable lien on the plane in question and for punitive damages.

Were it not for one case cited by plaintiffs, we would be inclined to consider the appeal as frivolous, since the fraud was obviously not extrinsic. Plaintiffs appeared in the earlier action and no claim is made that they did not have an opportunity to litigate the question whether or not a major overhaul had been performed in 1956. Indeed, in view of the various

---

[5]This is perhaps clarified in the second count.

records of which both this court and the superior court can take judicial notice, it would have been futile to advance such a contention. (*Varcoe* v. *Lee*, 180 Cal. 338, 343 [181 P. 223]; *Stafford* v. *Ware*, 187 Cal.App.2d 227 [9 Cal.Rptr. 706]; *Pike* v. *Archibald*, 118 Cal.App.2d 114, 116-117 [257 P.2d 480].)

It may well be that in the first action plaintiffs accepted representations made by defendants that there had been a major overhaul and merely disputed the cost.[6] The question, however, is not whether they actually disputed the fact of an overhaul, but whether or not they had an opportunity to do so.

There is no question that perjury to the court is intrinsic fraud. (*Jorgensen* v. *Jorgensen*, 32 Cal.2d 13, 18 [193 P.2d 728]; *Preston* v. *Wyoming Pac. Oil Co.*, 197 Cal.App.2d 517, 528-531 [17 Cal.Rptr. 443].) We should also have considered it as settled beyond dispute that where the lies told by the successful party to the court are mere repetitions of lies previously told to the loser, the fraud is also intrinsic. It would burden the citator unduly to add a long list of cases to support this proposition. We will content ourselves, therefore, by referring merely to *Jorgensen* v. *Jorgensen, supra.* There, Mrs. Jorgensen had previously procured an uncontested divorce after she and her husband had executed a property settlement agreement. This agreement was approved and adopted in the final decree. Later she tried to set aside the provisions of the interlocutory decree relating to the property settlement agreement on the grounds of fraud or mistake. She claimed that her husband had fraudulently misrepresented certain community assets as being his separate property. She and her attorney had relied on these representations. The superior court held that her complaint did not state a cause of action and the Supreme Court agreed, although it recognized that the husband as the manager of the community property occupied a position of trust and was therefore under a duty to the wife not to conceal any assets which are part of the community property. No such concealment was alleged. His representation that disclosed assets were separate rather than community, was merely a position favorable to his own interest, the truth of which the wife and her attorney had every opportunity to investigate.

---

[6]The pretrial statement of the present plaintiffs in the first action contains the following contention: "Defendants also contend that all of the money expended by the plaintiffs at the time of the overhaul of the aircraft was not directly related to the overhaul itself, and plaintiffs will be put to their proof on that issue."

The significant part of the *Jorgensen* case, for our present purpose, is the way in which the court distinguishes the duty of a fiduciary to disclose assets, from the duty of a husband or wife to disclose philandering. It referred to its earlier decision in *Howard* v. *Howard,* 27 Cal.2d 319 [163 P.2d 439] as follows: "*Howard* v. *Howard,* 27 Cal.2d 319 [163 P.2d 439], is clearly distinguishable from these cases, for in that case the husband did not allege that the wife procured the property settlement agreement by concealing information in violation of a fiduciary duty of disclosure. Her alleged fraud related to acts of adultery, which she was under no fiduciary duty to disclose, for those acts constituted a ground for divorce. The law imposes upon a spouse seeking a divorce the burden of proving facts constituting a statutory ground for divorce and of presenting corroboration of his own testimony or of admissions of the other spouse. (Civ. Code, § 130; Code Civ. Proc., § 2079; *Flynn* v. *Flynn,* 171 Cal. 746, 748 [154 P. 837]; *Deyoe* v. *Superior Court,* 140 Cal. 476, 483 [74 P. 28, 98 Am.St.Rep. 73]; see also Civ. Code, § 132; *Grannis* v. *Superior Court,* 146 Cal. 245, 248 [79 P. 891, 106 Am.St.Rep. 23].) If failure to reveal grounds for divorce warranted equitable relief from divorce judgments, the stability of such judgments and titles to property thereunder would be seriously imperiled." (*Ibid.,* pp. 21-22.)

It seems obvious to us that the relationship between Great Lakes and Smith with respect to the question of whether or not there had been a major overhaul of the aircraft was not fiduciary and that the parties dealt at arms length.

The case on which plaintiffs rely and which makes their argument colorable is *Stenderup* v. *Broadway State Bank,* 219 Cal. 593 [28 P.2d 14]. In that case the defendant bank held certain notes for collection and liquidation on behalf of plaintiff's assignors. Plaintiff then sued for an accounting and there was a trial as a result of which plaintiff was awarded a judgment in the sum of $1,227.97 and given possession of certain unpaid notes in a much larger sum. This judgment became final. When plaintiff tried to collect the unpaid notes he learned that nearly $10,000 had in fact been collected by the bank. In the accounting action the bank had admitted that it had held these notes as trustee. Plaintiff then filed another action alleging that he knew nothing about the collections and had offered no testimony to controvert that of the bank because he relied on it. The Supreme Court reversed a judgment based on a demurrer by the bank, holding that there was

extrinsic fraud. Unquestionably the result is correct, since the bank was a trustee and under a duty to disclose the facts to the beneficiary of the trust. Unfortunately this aspect of the case was not stressed by the Supreme Court in its opinion which simply said that if the bank's conduct was ''for the fraudulent purpose of preventing information as to the status of these notes from reaching plaintiff and to deceive him and the court, it was conduct extrinsic and collateral to the issue made by the pleadings . . .'' (*Ibid.,* pp. 596-597.) In saying so the court relied on *Caldwell* v. *Taylor,* 218 Cal. 471 [23 P.2d 758, 88 A.L.R. 1194], saying that that case had ''perhaps extended'' the definition of extrinsic fraud.

Whether or not *Caldwell* v. *Taylor, supra,* extended the definition of extrinsic fraud, it was a case where fraud had caused an heir not to contest the probate of a will within the statutory period of six months. Although the fraud which kept Caldwell from contesting the will was part of the same general scheme which allegedly had induced the decedent to make the will in the first place—which called for a discussion of the rule that the claim of extrinsic fraud must not be the fraud in controversy in the basic action—the Supreme Court did carefully distinguish the representations made to the decedent and to Caldwell and came to the conclusion that the latter were ''not an actual part and parcel of the original fraud . . .'' (*Ibid.,* p. 479.) Thus viewed, *Caldwell* v. *Taylor,* while a hard case on its facts, was a classic case of extrinsic fraud. *Stenderup* was quite different in that the plaintiff there had a full opportunity to expose the fraudulent testimony by the bank.

It seems significant that no case has been found which interprets *Stenderup* the way plaintiffs in the case at bench would have us do. We have found only two thoughtful discussions of the decision. The first in point of time appears in a comment in 23 California Law Review, page 86 which the author concludes as follows: ''Inasmuch as it was admitted that the defendants were trustees, it seems peculiar that the court did not base its conclusions on the ground that concealment by a trustee amounts to extrinsic fraud; there is ample authority for this doctrine, although none of the earlier cases have dealt with so extreme a situation.'' The second discussion appears in an opinion by Justice Marks in *Crow* v. *Madsen* (Cal.App.) 111 P.2d 7, 14. That case is not reported in the official reports because a rehearing was granted by stipulation and the appeal thereafter dismissed. (111 P.2d 663.) It is therefore no prece-

'dent, but since we agree with the views expressed we will quote from the unofficial report: ''If these rules are correct they bring many cases into harmony and rationalize others of which *Stenderup* v. *Broadway State Bank of Los Angeles*, 219 Cal. 593 [28 P.2d 14] is an example. In that case plaintiffs were creditors and had employed defendants to collect their debts. As they failed to secure satisfactory statements of the operations of defendants they brought suit for an accounting and recovered judgment. They subsequently discovered that defendants had collected over $9,000 more than the accounting disclosed; that defendants' testimony in the accounting action was false in that it failed to disclose these other collections. This judgment in the accounting case was clearly the result of perjury which constituted intrinsic and not extrinsic fraud under *United States* v. *Throckmorton, supra,* [98 U.S. 61 (25 L.Ed. 93)] and the many cases following it. But the defendants were the agents of the plaintiffs for the collection of these debts. The duty was imposed on the agents to deal fairly, not fraudulently, with their principals, to disclose the true facts and not to deceive their principals. If a breach of this duty may constitute extrinsic fraud, the results reached are in harmony with the many cases supporting the views we have expressed.'' Thus viewed, *Stenderup* v. *Broadway State Bank of Los Angeles, supra,* did not revolutionize the law of extrinsic fraud to the extent submitted by plaintiffs.

There is no need to dwell on the facts of *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.,* 322 U.S. 238 [64 S.Ct. 997, 88 L.Ed. 1250] also relied on by plaintiffs. That decision grew out of proceedings before the patent office and a suit in the United States District Court for infringement of a patent obtained by fraud. Federal law alone was applicable. The federal law pertaining to the vacation of judgments for perjury was first laid down in *United States* v. *Throckmorton,* 98 U.S. 61 [25 L.Ed. 93], a case followed in California by an unbroken line of decisions starting with *Weir* v. *Vail*, 65 Cal. 466, 470 [4 P. 422]. (See particularly *Pico* v. *Cohn*, 91 Cal. 129, 133-135 [25 P. 970, 27 P. 537, 25 Am.St.Rep. 159, 13 L.R.A. 336].) That the rule of *United States* v. *Throckmorton, supra,* as adopted by this state, is still our law is evident from the wealth of recent cases which have recognized its authority. (e.g. *Coffelt* v. *Coffelt*, 229 Cal.App.2d 659, 664 [40 Cal.Rptr. 513]; *Hopper* v. *Hopper*, 224 Cal.App.2d 446, 447-448 [36 Cal. Rptr. 767]; *Otani* v. *Kisling*, 219 Cal.App.2d 438, 442 [33 Cal.Rptr. 239].)

Federal law however has made substantial inroads in what one federal court has called the "harsh" rule of *United States* v. *Throckmorton.* (*Publicker* v. *Shallcross,* 106 F.2d 949, 952 [126 A.L.R. 386, 390].) The leading case for the view that perjury may entitle a party to equitable relief against the effect of a judgment is *Marshall* v. *Holmes,* 141 U.S. 589 [12 S.Ct. 62, 35 L.Ed. 870] (35B C.J.S.2d, Federal Civil Procedure, § 1245.) As far as we can determine *Marshall* v. *Holmes* has never even been cited in California, let alone followed. In the federal courts on the other hand, in spite of what appears to be a certain amount of confusion[7], *Marshall* v. *Holmes* seems to be on the ascendancy. *Griffith* v. *Bank of New York,* 147 F.2d 899 [160 A.L.R. 1340] appears to be a typical statement of the present federal rule: "And though it was once thought necessary that such fraud be 'extrinsic,' so that it could not have been considered in the original action, *United States* v. *Throckmorton,* 98 U.S. 61 [25 L.Ed. 93], the later cases no longer seem to adhere strictly to even this limitation. *Marshall* v. *Holmes, supra; Publicker* v. *Shallcross* (3d Cir.) 106 F.2d 949 [126 A.L.R. 386], certiorari denied 308 U.S. 624 [60 S.Ct. 379, 84 L.Ed. 521]; cf. *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.,* 322 U.S. 238, 245, 246 [64 S.Ct. 997, 88 L.Ed. 1250]." (147 F.2d 899, 901. Italics ours.)

Since there is neither authority nor reason for this court to abandon an unbroken line of state decisions, we are not persuaded that *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co., supra,* can affect the result herein. For that reason we need not extend this opinion by distinguishing it.

*Fleming* v. *Huebsch Laundry Corp.,* 159 F.2d 581, also cited by plaintiff, did not involve a question of extrinsic fraud and need not be further discussed.

■ Since it is evident from the prayer that the third count of the complaint for money had and received is based on the same transaction as the first two, it falls with them. (*Orloff* v. *Metropolitan Trust Co.,* 17 Cal.2d 484, 489 [110 P.2d 396].)

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

---

[7]See particularly the note in 21 Columbia Law Review, 268, quoted in *Publicker* v. *Shallcross, supra.*